Good afternoon, everyone. Welcome to the Illinois Appellate Court, 1st District, 6th Division. We're going to ask that the lawyers who are going to argue on the first case please step up briefly, introduce yourselves, and tell us who you represent. Good afternoon, Your Honors. My name is Brian Cook. I'm from the Office of the State Appellate Defender, and I represent the appellant, Jose Lopez. Say your last name again, please. Cook. Cook, okay. Good afternoon, Your Honors. Assistant State's Attorney, Alan Spadaug, representing the people of the state of Illinois. All right. Thank you, Counsel. Under Supreme Court Rule 352B, each side has 20 minutes for the main argument. The appellant has about 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. This is essentially a one-issue case, so hopefully you can keep within the time. And please remember to speak loudly. The clerk will call the first case. Dining number 15, 3331. We will work with Jose Lopez. Mr. Cook, you may proceed. May it please the Court, Counsel, this case, it does present one issue, I guess, with two sub-issues. And the first was, was there reasonable suspicion for the traffic stop of Jose Lopez? And if there wasn't, what evidence should be suppressed as a fruit of that illegal seizure? I'll start with the first question. And in answering whether there was reasonable suspicion, I believe that the most important factor to consider is the quality and content of information that the police received before stopping Mr. Lopez. And that gets to the basis of knowledge for the unknown source who provided the information that Mr. Lopez was driving drunk. All we know here is that we have a dispatch of a drunk driver. Yes, we know a description of the vehicle that that person was in. We know the location and direction of travel of that vehicle. But we don't know who the source of that information was. And more importantly, we don't know how or why that person concluded that the driver of that black Ford Expedition was drunk. Let me ask you, it was submitted police officer to police officer, was it not? We have a dispatch from, I guess we don't know if it was another officer or if it was a 911 operator. But someone made a dispatch to Officer Martinez, and he was the only witness to testify. So he testified about the information that he received. Okay, but did that or did that not come from a Chicago police officer? I believe it did. It did? Yes. So do we know anything about what was contained in that transmission? Just what Officer Martinez said. We don't, just what Officer Martinez testified to. We don't know, presumably the source of that information, the original source, made a report to someone in law enforcement, but we don't know exactly what that person said. But we don't really know, other than it was officer-to-officer contact. The officer didn't observe any of this, is my point. Correct. And I would point out, while an officer is entitled to rely on information received from other officers, in order to rely on that sort of collective knowledge background, we need to know what other people in law enforcement knew. So if an officer is making a warrantless arrest, it's not enough to simply say there was an investigative alert. We need to know what that investigative alert was based on. Same thing here. We need to know what the dispatch was based on. We need to know specifically what the source's basis of knowledge was. I mean, there could be other bases, but we just don't know about them. We just don't know. And in this case, it was the State's burden of producing that evidence. I don't think there's any dispute among the parties that Mr. Lopez met his initial burden of making a prima facie case. Well, the initial message that came across over the radio, was that sufficient to be a reliable and adequate amount of factual evidence to establish reasonable suspicion of drug crime? No, and I think the main reason is what it did allow the officer to do was reliably identify a specific person, but there's nothing in the evidence that was presented at the special hearing that allows us to infer a reasonable allegation that Mr. Lopez was doing something illegal. I would point this court to Navarrete versus California. That was a case from a few years ago that went through in detail about what it takes to establish reasonable suspicion to stop someone for DUI. And one of the key things that the court knew there, they knew that an eyewitness called 911 and specifically reported that they had just been run off the road by a specific vehicle. And the police were able to locate that vehicle. And part of the dispute between the five justice majority and the descending justices in that case was whether the sort of driving that the source had described being run off the road, whether that was a serious enough offense, a serious enough traffic violation, to reasonably infer that that driver was drunk. And the majority said that, yes, knowing that someone ran someone else off the road allows us to reasonably conclude that the driver was drunk. But they acknowledged that it was a close case, and they specifically distinguished or contrasted that close case where they had some specific information with a case in which there was a description of just a minor traffic infraction or just a conclusory assertion of drunk or reckless driving. And that's what we have here. All we have is a conclusory assertion of drunk driving. We don't know if that source is an eyewitness. And if that person was an eyewitness, we don't know what they specifically saw that led them to conclude that the driver was drunk. And I think, you know, where you're sort of headed here and what I've observed in preparing for this case is the fact pattern we have here falls smack in the middle of Navarrete on one side and Florida v. J.L. on the other side. You've got two relatively recent U.S. Supreme Court cases. Navarrete's the more recent. Correct. And it's a 5-4 decision. You've got a rather scathing dissent by Justice Scalia there. Correct. Which actually takes your side of the case, right, as I recall. To a certain extent, I think. But we do have that information. There's a lot more information known to the court in Navarrete to judge the reliability. Don't we have more here in the record than they had in the Florida case? To help justify this stuff. Well, no, I don't believe so. One key thing here may be that this is a very small geographical area. You're talking about 52nd California or whatever the number of streets was. I mean, you'd have a cop who's right there, right at the right intersection at the right time, sort of blinks his eyes and, boy, there's the cop. But I think the similarity to J.L. is in that case you have someone who provided information to the police. We didn't really know how, but they identified a specific person wearing a, I think, a pretty specific description of a shirt, a plaid shirt or something, had a specific bus stop and they said that person was carrying a gun. And what the court in J.L. said, one, we don't know that source's basis of knowledge, just as in this case we don't know the source's basis of knowledge for concluding that the driver of that expedition was drunk. All we have is a source who we know was able to identify the appearance and location of a specific person along with a conclusory assertion that that person was doing something illegal. I think another good case to look at, it's United States versus Weed. It's a somewhat older case. It's a federal case that the state cited in their brief about reasonable suspicion for DUI stops. That was actually very shortly after J.L. and they were kind of struggling with, I think, the same sorts of things that this court is looking at in this case. And what they said there is that one of the factors you look at, does the tip have enough information to infer that the source witnessed an actual traffic violation that requires an immediate stop? And the reason that they said you need to have some basis of knowledge, you need to know what that person observed, is because I think it's black-letter law for Terry stops that whether it's a police officer, an eyewitness, a concerned citizen, a hunch is not enough to provide reasonable suspicion. You have to have a particularized and articulable basis for concluding that the person you're making an allegation against either has committed a crime or is committing a crime. And so what the weak court observed is without some detail about what that source observed, we don't know if it's just a hunch or if it is truly reasonable suspicion. Counsel, let me ask you a question. Sure. Did the officer testify that the defendant was an occupant of the car or the driver of the car? I think he generically said occupants. And I think he said after he stopped the vehicle, he observed that the defendant was an occupant. Is there any question that he was behind the wheel or was not? There's no evidence that there was anyone else. I think he's just testifying in the heat of the moment. And there was, of course, the misstipulated bench trial. Would the deletion of the driver make any difference to the scenario here? Let's say he came upon a driver who was totally, completely intoxicated. Okay, sure. All the effects of that, does it make any difference at all? It doesn't make any difference when we're asking did the officer have reasonable suspicion because I think it's pretty well established that the state, the police, can only rely on what they knew before the seizure to justify a seizure. You can't justify a post hoc. You know, I had a tip that someone was dealing drugs, so I searched him and found drugs. The fact that you found those drugs after seizing and searching the person can't be used to then justify the stop. But I would point out, in this case, we know, I think, that Mr. Lopez was not intoxicated, even though Officer Martinez was investigating what he believed to be drunk driving. He didn't do a breathalyzer. He didn't do any field sobriety tests. He only arrested him for driving on a suspended license. And while that doesn't sort of retroactively invalidate the search, if it was otherwise based on reasonable suspicion, which I don't believe it was, but the fact that the source was wrong, I think, as a policy matter, indicates why courts and why law enforcement need more information before making a stop. You shouldn't just accept someone's conclusory assertion because that assertion could be wrong. And if a court doesn't have more information about why the person came to that conclusion, there's no way for a court to make any sort of informed decision about whether there was indeed reasonable suspicion or whether it was just an insufficient hunch. Did he run the plate to see if there was anything on it before the stop? There's no evidence that he did. I mean, if that had happened, that could have made a big difference, but it didn't. I mean, you certainly can't blame the officer. He had a report of drunk driving. I think what needs to happen here is that, and it happens in plenty of cases, Navarrete, Schaefer, DePace, cases at the state sites. In those cases, the person who originally got the information from the source, all they really had to do was ask one question, how do you know or what did you see? And that's not a heavy burden to impose on the government. And at the same time, imposing that burden, I think, strikes a proper balance between protecting the right of motorists to be free from unreasonable traffic stops while at the same time protecting the public's interest in the safety of the roads. If you have no questions about that aspect of the issue, I can move on. Okay, so I'm going to end with the exclusionary rule issue here, which is perhaps a little more novel unless case law is directly on point. There are two pieces of evidence that should be suppressed because they were obtained as a direct and immediate result of the illegal traffic stop. And the first is Officer Martinez's observation, which by his own admission came for the first time after the stop, that Lopez was operating the vehicle, which is an element of the offense. The second is Lopez's driving records, which Officer Martinez also learned of only as a direct result of the illegal stop. As Your Honor pointed out, there was no indication that he was running the plates or doing some other independent previous line of investigation that would have inevitably led him to that same evidence, which was, again, another piece of evidence that was essential to the State's case. The State has, on appeal, offered two theories for why that evidence shouldn't be excluded. And the first has to do with deterrence. They rely on the case of Herring v. United States to argue that the police misconduct here was not flagrant enough or culpable enough to justify exclusion. But Herring was distinguishable. It recognized a very limited and narrow exception to the exclusionary rule in a case in which there was an isolated instance of negligent record keeping by a police employee who failed to update records to indicate that a now-invalid warrant was invalid. So it appeared to still be a valid warrant. Officers relied on it and made an arrest. And the court recognized that that sort of error, you know, excluding evidence wouldn't really justify, wouldn't deter that sort of negligence enough to justify the cost of exclusion. But here we have the sort of error that can be deterred. We have law enforcement making a stop without a warrants and without having obtained enough information to justify that stop. That is the sort of misconduct, while it may not be the most flagrant violation of the Fourth Amendment, deterring evidence in that situation gives the police an incentive to make sure that they have done enough investigation or just ask in this case one more question to get the evidence they needed to justify a stop. If you suppress evidence in this situation, you can deter that sort of misconduct. And that is the kind of warrantless stop, whether it's a warrantless stop or a warrantless arrest, that for decades since Mapp v. Ohio has consistently led to the suppression of evidence. And neither the U.S. Supreme Court nor the Illinois Supreme Court has adopted the sort of enormously broad good-faith exception that the state is asking this court to adopt. I would also point out as to deterrence, the other side of that calculation is the cost of exclusion. And as I pointed out, so for example, say guns or drugs have been found in this search. I think Blackwater law is, you know, the officer makes a stop, sees some cocaine in plain view on the front seat. Plenty of cases have suppressed evidence in that situation, even though that drug case or suppose it had been a gun, that gun case is a far more serious crime than the one that we have at issue here. So in those situations where it's pretty clear evidence has consistently been suppressed in the past, the cost of exclusion is far greater than it would be here. So when you're balancing the deterrence effect of exclusion against the cost, I think when you have a less serious crime like driving on a suspended license, the balance even more strongly favors this. There was reasonableness on the part of the officer. When you get a call or strong suggestion there's a DUI driver, DUI drivers are known to damage property, to hurt people, to kill people. Sure, absolutely. So the first thought maybe the officer was, well, I'm going to protect the public here, and I have a reasonable suspicion. What do you think about that? I think if you look at Herring, Herring kind of went back before they analyzed culpability in that case and whether deterrence justified exclusion. They started by saying, by pointing to a mid-80s case, Leon, which established a good faith exception for reliance on a warrant issued by a judge. And what they said is that when you are looking at whether suppression would deter, you have to analyze the culpability of all the law enforcement officials involved in the illegal stop. You don't just look at the last officer who, say, in the Leon situation, got the warrant and actually executed it. You would have to look at the culpability of the officers who investigated the case and got the evidence and submitted that evidence to a judge for a warrant. If those officers were culpable, then you might have suppression. Likewise, in Herring, they looked at the culpability of the employee who made the record-keeping error. Even though it was perfectly reasonable the officer who made the warrantless arrest didn't do anything wrong, you have to look at the culpability of the other person. And here we have to look at the culpability of the person who initially talked to that source who is unknown. Let me ask you, go ahead, as your time is leading, to talk about the State's Lopez Mendoza argument of suppressing the body, that this is really a case. Stop me if I say too much of what's already in the briefs. But Lopez Mendoza, that was a consolidated case, but Mr. Lopez Mendoza was illegally arrested and the government instituted a deportation proceeding against him. And he never argued that there was any evidence that should be suppressed as the result of his illegal arrest. He merely made what was, I think, what the Supreme Court recognized to be a borderline frivolous argument that because he was illegally arrested, the immigration court had no power over him to subject him to deportation. Was he arrested for an immigration violation or was he arrested for something? I don't know. I think it was maybe, I don't know if it was some sort of immigration sweep. I don't recall, but I think by the time it made it to the Supreme Court, I don't think they were disputing whether the arrest was illegal. They were just disputing what the consequences would be in the immigration proceeding. And all Mr. Lopez Mendoza argued was that the immigration court lost the power to deport him because of the illegal arrest. And the U.S. Supreme Court dealt with that in just two paragraphs. And they relied on pretty well-established case law going back to the 19th century to say that an illegal arrest never deprives a court of jurisdiction over a defendant. It never deprives a court of the power to try a defendant, whether it's in an immigration proceeding or a criminal proceeding. And in the context of making that holding based on that case law, they did say the body or identity of a defendant can't be suppressed. But to interpret that without considering the context in which that argument was made and the case law that that assertion relied on, I think, takes an assertion meant to address a specific legal argument made by Mr. Lopez Mendoza and expands it beyond all recognition to now categorically exempt identity-related evidence in a completely different type of proceeding, a criminal proceeding, in which it is well-established that the exclusionary rule does apply. And so to take that holding and expand it that much, I think, is unreasonable. I think Garcia Garcia, which is a Seventh Circuit case, where they kind of addressed this in dicta after finding that a search was lawful or a seizure was lawful, they briefly addressed Lopez Mendoza. I think they just misinterpreted it. And let me ask you to bring your remarks to a close, please. Okay. Thank you. Mr. Spellberg. Good afternoon again, Your Honors. Counsel, may it please the Court. Again, I'm Assistant State's Attorney Alan Spellberg. And I'd like to address first the question that you asked originally, Justice Stilett, where does this case fall along the line between Navarrete and J.L.? And I think you were 100% correct when you say that it is smack dab in the middle of those two cases because unlike Navarrete where there was a specific allegation as to what the driver had been doing that came through the 911 call about crossing, weaving over the lines, this was the assertion in the flash message here was there's a DUI driver at 43rd and Pulaski driving a Lincoln Navigator with NZ1. Shortly thereafter, the officer sees a car that matches that description with the license plate N211013 and pulls it over without seeing any additional driving violations. That's very similar to Navarrete in that the police officer didn't see any additional driving violations after pulling it over after receiving the flash message. But there is admittedly more detail in the report in Navarrete. But importantly, the detail in the report here and the flash message here is more significant than the report that occurred in the J.L. case. The Navarrete court seemed to place very significant emphasis or reliance on the fact that it was a, the record demonstrated it was a 911 call and that when people call 911 their identity is flashed on the screen, their number is recorded. And the problem we've got with this record here is, as you know, it was tried by a 7-11 student. The trial probably lasted 5 minutes and there's very little in this record. There's a lot of questions that could have been asked that weren't asked. So we don't have some of the things that the court in Navarrete relied on. Your Honor, 100% correct. I'm not going to say that the record isn't as fleshed out as it should be. I wish that those additional questions had been asked about the source of the flash message, what was occurred, what was precisely said. Some additional reports and or witnesses would have been useful for us here on appeal, without a doubt. But accepting the record as we have it today, accepting the findings of the trial judge in this case, and knowing what we know, which we have, we have a report of a drunk driver, admittedly conclusory, but a report of a drunk driver in a very narrow geographic area in a very short time frame, I mean less than 2 minutes is my recollection of what the testimony was. The police officer sees the car that matches the description and he pulls it over. And the reason why he pulls it over is because the case law has recognized, post-J.L., most significantly here in Illinois, the Schaefer case, has recognized that when a police officer receives a report of something like that, the significance of public safety, it authorizes him to engage in the limited nature of a traffic stop, the limited Terry stop, because it is such a minimal intrusion on somebody's Fourth Amendment rights. It is admittedly an intrusion, but it's a minimal one, the traffic stop. And so the police officer is allowed to do that. And the reason why I bring up Schaefer is the key case, and Schaefer relies on the weak case that counsel referred to. Schaefer, other than it being an implied 911 call, it doesn't say it was a 911 call in itself, but it was a report from an employee at Wendy's saying that there was a disturbance at the drive-thru window and they're drunk. A disturbance is just as general as drunk driving. It doesn't say that there was any sort of weaving, anything where it could just have been rowdiness in its own regard. But there you've got the connection with the Wendy's employee saying that they were, presumably the Wendy's employee was at Wendy's and so was the other person who was the suspect. Right. So you've got that connection which you don't have here. I recognize that completely. I know the limitations of the arguments based upon the facts in this case. I completely see that. But the key there is that the context and what the Schaefer opinion said is that we don't know who the Wendy's employee is. We know it was a Wendy's employee, meaning we know it was somebody who was concerned enough to report this. Based on Schaefer, counsel, why didn't the officer, when he stopped him, try to see if there was any drunk driving involved, if there was the smell of alcohol, if there were red eyes, if there were whatever? He didn't do any of that. I don't know what you're saying. The record is my recollection shows that he walks up to the car, he asks for his ID, he's given a state ID. He then immediately learns that the defendant's license has been suspended. Well, he didn't immediately. He got his license. By receiving a state ID, that was the next step, I believe. Okay, but I understand. But wouldn't it be a different argument, though, if he was investigating the DUI, which was the reason for the stop? It would be additional facts, absolutely, Your Honor. But it's in terms of the legitimacy of the stop itself, what the officer does right after that, I'm not sure necessarily validates or invalidates it. Did he have the authority to pull the defendant over to stop his motion and pursue it to police authority? So what is more authority, having proof of the reliability of the informant or the public safety you are arguing Schaefer? Well, Your Honor, I think it's the totality of the circumstances here. And what we have is we have Schaefer recognizing the significant public policy concerns and public safety risks associated with drunk driving. We have a flash message, which is more detailed than that in J.L. because it does give indication of future behavior in the sense of the location, the time, and the police officer finding him right there, not simply somebody standing there allegedly with a concealed gun, not knowing what the basis of the knowledge might be. Mr. Schaefer, would it make any difference if the message that came from another police vehicle was, we have an erratically driving automobile heading on Pulaski, et cetera, et cetera, and describing it as an expedition, et cetera. Would it make any difference if DUI was out of the picture here, an erratically driving motorist? Or weaving it out of lane circuits? Well, weaving it out would certainly be sufficient because that's what the allegation was, or very similar to the allegation in Navarrete, other than being driven off the right. It was an additional point, but there is case law out there recognizing weaving. Erratic driving, in my mind, is just as conclusory as a drunk driver. Importantly, the Wheat case, the allegation that came over the message was erratic driving. I believe that was also a 911 call. The evidence establishes it was a 911 call in that case. But the nature of the substance, the substance of the claim was the erratic driving, which in my mind, Your Honor, and I submit to you, is similar to the conclusory nature of drunk driving. So would we be saying that every flash message that comes across the police officer's screen is going to be sufficient for Terry Stout? No, Your Honor, and that's not our position. But in the totality of the circumstances, which has to be assessed at this point, even for Terry Stout, in this circumstance when there's a flash message coming out identifying a particular car in a particular location with the allegation of drunk driving, and then an almost immediate intersection with the police officer, that police officer was reasonable in doing so. And as counsel even admitted, it's understandable why the police officer did that, that it wasn't flagrant in that regard. It was, without a doubt, a close case, much like JL was a close case, much like Navarrete was a close case, much like LLM v. Wade, which is discussed in both of them as a close case. But this was a close case, and it's our position, as a trial judge, found on the side of propriety that the traffic stop was proper. But moving on to the question of exclusion, I want to clarify a couple of important points. First off, our discussion in our brief of Herring and Golan and Willis and Hudson is not an assertion that there should be some broad good faith exception applied across the board for the exclusionary rule. What those cases all recognize, both from the Illinois Supreme Court and the U.S. Supreme Court, is that the exclusionary rule is not one of automatic application. Instead, it is a jurisprudential doctrine, both under Illinois law and federal law, that it is appropriate to deter police misconduct. And if it doesn't deter police misconduct, it's not appropriate to apply it in a particular case. And there's nothing new or extraordinary about that. Every court that addresses the exclusionary rule says that. Most importantly, and we cite this in our brief, the Willis case from the Illinois Supreme Court. Again, that was a case where there was an allegation that there had been a Fourth Amendment violation, but the court said the exclusionary rule isn't going to apply. And so the sole purpose, and I don't want this court to have the impression that we're making the assertion the exclusionary rule shouldn't apply in Cook County. That's not our position. What we're asking this court to do is to be consistent with the case law from the U.S. Supreme Court and the Illinois Supreme Court to recognize that the exclusionary rule is not automatic. It applies in the appropriate cases when misconduct can be deterred appropriately. And as counsel recognized, this is understandable behavior by the police officer, particularly, I would submit, in light of the Schaeffer decision, which is very, very similar. But more importantly, sorry. So, you know, are you heading to the position that if we are to assume for the sake of argument that the stop was not justified, that it doesn't matter because having stopped the car, he got the I.D. and ran the license. Yes, Your Honor, that is exactly what I was going to say. Assuming this court were to disagree and rule that the trial judge erroneously found that the stop was not valid under the Fourth Amendment, that there's still no basis to suppress any evidence in this case. And our argument is, obviously, one, that there's nothing to deter because the police officer didn't really engage in misconduct here. He managed to cross over a very fine line. But more importantly in this case, and I think that counsel is wrong when he tries to assert that the Lopez-Mendoza line of cases is one of such a narrow concern because it's not. In Lopez-Mendoza, it was two defendants who were charged with immigration violations and who were arrested pursuant to immigration violations. Lopez-Mendoza only made the argument of it should be dismissed because it was an unlawful session. Sandoval-Sanchez, who is the co-defendant in the case, argued no, but the evidence should be suppressed. And the court ultimately went through the evidence that was offered and found that it wasn't appropriate to deter any behavior, even if there was a Fourth Amendment violation. The court stressed that they don't in any way sanction Fourth Amendment violations. It's not appropriate in here. Much of that discussion is properly because it was a civil deportation hearing as opposed to a criminal prosecution. I admit that. But the key, and I want to stress this, I want you to look at it, requires careful reading. In the part of the opinion regarding Sandoval-Sanchez, the court in discussing what evidence should be suppressed was talking about whether or not the defendant's statements to the immigration officers should be suppressed. They were in no way offering or even seeking to suppress the fact of his presence in the United States. He was charged with being in the United States after previously being excused. No way moving to suppress his presence in the U.S. or, importantly, the observations of the INS officers who see him and found him there and then who identified him at the hearing saying that they saw him where he was. So this notion that the Lopez-Mendoza line of cases only applies to the jurisdiction of the courts, the personal jurisdiction of the courts, I don't think is supported by the Lopez-Mendoza case itself. And that's further proven by the Garcia-Garcia decision from the Seventh Circuit. Garcia-Garcia, as counsel stated, made the argument, let me clarify, that was a criminal investigation, a criminal prosecution, not an immigration prosecution. He was pulled over because the police officer found that the air freshener hanging from his rearview mirror amounted to an obstruction. He claimed that it was not a sufficient basis for an obstruction, so therefore everything should be suppressed, throwing all the evidence, including the fact that he was there transporting other illegals and that he had previously been removed from the country. He was convicted in the Seventh Circuit on appeal. One did hold that at least there was a reasonable basis for the police officer to believe the air freshener could be a significant obstruction. But then the court held, which I believe is more important because it's a broader ruling than this very narrow ruling about the air freshener, the court held that under Lopez Mendoza there is no basis to suppress the defendant's identity and coming off of the defendant's identity are his immigration records that he had previously been deported and reentered, as well as the police officer's observation seeing him there and transporting the other individuals. And so Garcia-Garcia is very similar to this case in that it talks about the evidence of the defendant doing what he's doing, independent from anything that is recovered from the defendant that day. But in Lopez Mendoza, it was the actual characteristic of the human being as being an undocumented visitor to the United States that had nothing to do with anything he did as an action. Here, the crime that Mr. Lopez was charged with was driving, it's a verb with an ing at the end, while having license suspended, which is not his person, it's an action. And I see that as a distinction that may be important. And that's very similar to the distinction that I believe was made by the Florida court in State v. Perkins, which is cited in the defendant's brief. Counsel, any other cases that support your argument? Lopez Mendoza has very few cases across the country. Florida seems to be the leading case that's out there. I believe that's the case, but there is a fair amount of cases from federal circuits. Going back and forth, some courts accept what the Seventh Circuit says, other courts say what the Ninth Circuit says, which is similar to what Perkins had held. So there is that dispute. This isn't an issue that comes up very often because, thankfully, it's not that common. The police officers are just going to make a staff-based defense solely on a flash message without seeing anything else. And even if it does, either they get suppressed or it's bled out, it doesn't come to the appeal. But there are very few cases. And so then it's an even more narrow case where we're talking about the defendant's identity. So this is nearly a case of first impression for here in Illinois. I think there's one or two cases that even cite Lopez Mendoza, not for the actual holding of the case, though. But at its core, what the defendant is trying to suppress is his identity. He was driving that car. That was never contested that day, and the car was seen driving that day, and the officer did see, after he stopped him, did see him sitting there in the car. His driver's records, his driver's abstracts, which were discovered after the fact, that is directly affidavit to his identity. So the only real evidence which counsel could attempt to suppress would be the officer's observations after he made the stop, after he got out of the car and walked over to him. And it's our position, Your Honors, that that is not an appropriate basis of suppression, that there is not an abuse of the Fourth Amendment there, there's not a violation of any significant degree, and it is nothing more, really, than the defendant's identity that's being offered against him. Much like in Lopez Mendoza and Sandoval Sanchez and Garcia Garcia, the officers were still able to identify the person that they arrested on that day. If there's no further questions, we'd ask this Court to affirm. Thank you. I'll try to be brief, Your Honors. I think we covered a lot of material in both of those arguments. As to the legality of the stop, I'd like to address just a couple of the cases the State mentioned. Mr. Spelberg talked about People v. Schaefer, and I think, as Your Honor pointed out, there were significant distinctions there. We knew that there was a Wendy's employee. The Court noted that that employee had to have been in close proximity to the defendant, and by observing the defendant driving at the drive-thru, able to see that he was making a disturbance, that person was in a position, based on what the Court knew from the evidence at the suppression hearing, to make a reliable, to draw a reliable conclusion that the driver was drunk. As to the point about whether a tip about erratic driving would be enough, counsel talked about United States v. Wheat. And in Wheat, the case actually was more specific than just a report of erratic driving. The person specifically said that there was another car on the highway, passing other cars on the wrong side of the road, cutting other cars off. So it was a far more serious and detailed allegation than just a claim of erratic driving. As to the breadth of the good faith exception that the State is asking for, I think it's broader than maybe counsel was suggesting. If, in this case, you hold that a Terry stop, in which the officer didn't quite have reasonable suspicion but thought that he did, if you hold that that is exempt from the exclusionary rule, that could apply in any number of contexts in which the police have either made a traffic stop, a stop and frisk, whatever the case may be. Those police-citizen encounters happen all the time. And it's not that uncommon for the police to have some information but not enough to justify the stop. So if you were to adopt that kind of reasoning for why exclusion should not apply, it actually would, I think, apply more broadly to eliminate suppression for lots of culpable police misconduct. My final point, I just want to address the Sandoval-Sanchez half of the Lopez Mendoza opinion. I would just reiterate that in holding that the exclusionary rule didn't apply to the statements that Mr. Sandoval-Sanchez was trying to suppress, the U.S. Supreme Court said nothing about whether identity evidence is suppressible, whether it's this sort of category that doesn't qualify under the exclusionary rule. They were simply weighing whether the cost of exclusion in that civil deportation proceeding was outweighed by the deterrent effect of exclusion. They were not addressing at all categories of evidence or anything like that. It was simply the Lopez Mendoza brief holding as to Lopez Mendoza that addressed that issue. So for those reasons, we would ask that this Court find the stop illegal, suppress the evidence, and reverse the conviction for driving on a suspended license. Members of the panel have any other questions? No, thank you. No, thank you, counsel. Thank you. The matter will be taken under advisement, and the Court will stand at ease for a few moments to allow the attorneys to switch for the next case.